**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **RICHARD THOMPSON, Trustee of The Thompson Family Trust** | ) ) ) | |
| Plaintiff, | ) ) | Case No. |
| vs. | ) ) | |
| **RONALD FAJERSTEIN, FAJERSTEIN DIAMOND IMPORTERS & CUTTERS, INC., and ANTWERP DIAMOND IMPORTERS & CUTTERS, INC.** | ) ) ) ) ) ) ) | Jury Trial Demanded<br>FILED:   JUNE 4 , 2008<br>08CV 3240      NF<br>JUDGE KOCORAS<br>MAGISTRATE JUDGE MASON |
| Defendants. | ) | |

## COMPLAINT

Now comes Plaintiff Richard Thompson, as Trustee of the Thompson Family Trust ("Thompson"), by and through his attorneys, for his complaint against Ronald Fajerstein, Fajerstein Diamond Importers & Cutters, Inc., and Antwerp Diamond Importers & Cutters, Inc. (collectively, "Fajerstein") and states as follows:

### NATURE OF THE ACTION

1.   Thompson brings this action to recover monies he provided to Fajerstein for a diamond he never received. As Thompson has learned subsequent to his dealings with Fajerstein, Fajerstein has been sued before, and is currently being sued, for similar fraudulent schemes and practices (indeed, racketeering) in connection with his diamond business.

2.   In January 2008 Thompson contacted Fajerstein, a diamond dealer, and provided a detailed description of a diamond he hoped to purchase for his wife as a Valentine's Day gift.

Through a series of false statements and misrepresentations, Fajerstein convinced Thompson that he could locate the diamond Thompson described if Thompson would send Fajerstein half of the expected purchase price, $300,000. Relying on these representations, Thompson wired $150,000 to Fajerstein. Rather than locating the diamond that Thompson requested, Fajerstein used the money for his own business and personal purposes and has not returned the money to Thompson, despite Thompson's repeated demands and Fajerstein's acknowledgement of the debt and promises to repay the funds.

3. This action, which seeks in excess of $650,000 in damages, is brought to recover Thompson's $150,000, plus interest, attorneys' fees, and punitive damages in an amount no less than $500,000 to punish Fajerstein for his willful, wanton, and malicious conduct.

**JURISDICTION AND VENUE**

4. The Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332 (diversity jurisdiction) because the matter in controversy exceeds $75,000, exclusive of interests and costs, and is between citizens of different states.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because Fajerstein resides in this judicial district or has transacted affairs in this judicial district, a substantial part of the events and omissions giving rise to Thompson's claims occurred in this judicial district, and a substantial part of the property at issue is situated in this district.

6. The court has personal jurisdiction over Ronald Fajerstein, an Illinois resident, Fajerstein Diamond Importers & Cutters, Inc., an Illinois corporation, and Antwerp Diamond Importers & Cutters, Inc., an Illinois corporation, by virtue of their contacts with the State of Illinois and through the tortious acts they committed in the State of Illinois.

## THE PARTIES

7. Plaintiff Richard Thompson is a Trustee of the Thompson Family Trust, and he maintains his principal residence in Atherton, California, where the Thompson Family Trust is being administered.

8. Ronald Fajerstein is an individual who, on information and belief, maintains his principal residence in Cook County, Illinois.

9. Fajerstein Diamond Importers & Cutters, Inc. ("Fajerstein Diamonds"), on information and belief, is an Illinois Corporation with its principal place of business at 67 E. Madison St., Suite 1730, Chicago, IL 60603 in Cook County, Illinois.

10. Antwerp Diamond Importers & Cutters, Inc. ("Antwerp Diamonds"), on information and belief, is an Illinois Corporation with its principal place of business at 67 E. Madison St., Suite 1730, Chicago, IL 60603 in Cook County, Illinois.

## FAJERSTEIN'S SCHEME TO DEFRAUD

11. Fajerstein Diamonds and Antwerp Diamonds are businesses that purport to specialize in the wholesale purchase and sale of diamonds. On information and belief, Ronald Fajerstein is the President of Fajerstein Diamonds and Antwerp Diamonds.

12. Thompson first met with Fajerstein in the fall of 2007 in San Francisco, California to discuss the possibility of purchasing a diamond. Fajerstein represented that he had significant experience buying diamonds and showed Thompson documents indicating that he purchased diamonds from the diamond exchange in Antwerp, Belgium. Fajerstein told Thompson that Fajerstein did not usually search for specific diamonds for consumers, but he would be willing to make an exception for Thompson and look for a specific stone.

13. On or about January 24, 2008 Thompson called Fajerstein, who is located in Chicago, Illinois, and inquired about purchasing a diamond for his wife before Valentine's Day. Thompson told Fajerstein that he was interested in purchasing an investment-quality diamond weighing seven or eight carats, and that he was expecting to spend approximately $300,000.

14. Thompson specifically told Fajerstein that he did not want to purchase a diamond with strong blue fluorescence because the color of the diamond was very important to his wife. Thompson indicated that the actual stone and price were subject to his approval and the entire transaction needed to occur before Valentine's Day, February 14, 2008.

15. During that January, 2008 conversation, Fajerstein assured Thompson that he could locate a diamond with the characteristics Thompson described and he could complete the transaction before Valentine's Day. Fajerstein told Thompson, however, that in order to obtain a diamond with those characteristics, Thompson must wire half of the expected purchase price to Fajerstein. Unbeknownst to Thompson, Fajerstein was lying – he had no ability or intention to obtain the specified stone by Valentine's Day, and no intention of returning Thompson's money or using Thompson's money for the agreed upon purpose.

16. On January 25, 2008, in reliance on Fajerstein's representations, Thompson wired $150,000 to Fajerstein for the purpose of purchasing the specific diamond he described in his conversation with Fajerstein. A copy of the wire documentation is attached hereto as Exhibit A.

17. On or about February 4, 2008, Fajerstein informed Thompson in a phone conversation that he found a diamond that met Thompson's specifications with one exception. The diamond he located was significantly larger than Thompson requested; it was an eleven-carat stone. Fajerstein described the diamond and indicated that it was one of the most beautiful

stones Fajerstein had ever seen. Importantly, Fajerstein concealed from Thompson in this discussion the material fact that this larger diamond had strong blue fluorescence, a quality that Fajerstein knew would be completely unacceptable to Thompson. Fajerstein told Thompson that he would purchase it on his behalf if Thompson paid Fajerstein an additional $300,000, which would bring the total purchase price to $450,000.

18.     Relying on Fajerstein's description of the diamond, Thompson said that he would be interested in purchasing the diamond. Fajerstein requested that Thompson immediately wire him $300,000, the balance of the $450,000 purchase price, so that he could purchase the diamond. Thompson declined to wire any additional funds until he could verify that the diamond conformed to his specifications.

19.     At Thompson's request, on February 6, 2008, Fajerstein sent Thompson a certification from the Gemological Institute of America ("GIA Certification") which indicated that the diamond had strong blue fluorescence, even though Thompson had specifically told Fajerstein that he would not purchase a diamond with strong blue fluorescence.

20.     Thompson immediately called Fajerstein on February 6, 2008 and said that he would not purchase the diamond.

21.     After receiving a GIA Certification that directly contradicted Thompson's description of the desired diamond, Thompson became increasingly suspicious of Fajerstein and took the GIA Certification to a local jeweler for his assessment. The jeweler indicated that the diamond described was not worth $450,000 and, in fact, Fajerstein's price was inflated by as much as approximately $100,000 – $150,000.

22.     On February 9, 2008, Thompson called Fajerstein and requested that he return the $150,000 since it was now clear that (1) Fajerstein was not going to be able to procure a diamond meeting Thompson's requirements by the specified February 14 deadline and (2) Fajerstein could no longer be trusted. Thompson also emailed Fajerstein instructions for wiring the money back to him.

23.     Fajerstein called Thompson early in February and began pressuring him to purchase the diamond even though it clearly failed to meet the agreed upon specifications. Fajerstein said that Thompson would not be able to see the blue fluorescence and that he would come to California to show Thompson the stone. Fajerstein accused Thompson of backing out of the deal, said he had never had any problems like this before, and tried to convince Thompson that he was obligated to purchase the diamond. Thompson resisted Fajerstein's pressure tactics and, eventually, Fajerstein said that he had already purchased the diamond and could not return Thompson's money. Since Thompson would not acquiesce to Fajerstein's demands, Fajerstein offered to do another search for a diamond that met Thompson's specifications. Thompson, who had lost all trust in Fajerstein by this time, declined the offer and requested that Fajerstein return his money immediately.

24.     Thompson called Fajerstein several times to request that Fajerstein return the money, but Fajerstein initially would not even respond to his calls.

25.     On or about February 20, 2008, Fajerstein agreed to return Thompson's money and said that he could wire $50,000 that day if Thompson agreed to pay an exorbitant "restocking fee" of $15,000. Thompson refused to pay the $15,000 and requested that Fajerstein return the full $150,000.

26. On or about February 29, 2008, Fajerstein agreed to return the full $150,000 and asked for a payment plan which would allow him to return the money in three installments of $50,000 by paying the first installment on March 5, 2008, the second installment on April 5, 2008 and the final installment on May 5, 2008. *See* Exhibit B, an email between Thompson and Fajerstein confirming the payment plan. Thompson agreed to accept this payment plan, but he never even received the first installment.

27. To date, Fajerstein has not returned any of Thompson's money.

## FIRST CLAIM FOR RELIEF
### (Illinois Consumer Fraud and Deceptive Business Practices Act)

28. Thompson adopts and realleges the allegations contained in paragraphs 1 – 27 as though fully set forth herein.

29. Fajerstein engaged in deceptive or unfair acts or practices, in violation of 815 ILCS 505/2, in the conduct alleged above, including misrepresenting his services, inducing Thompson to wire Fajerstein money, misrepresenting the quality of the diamond he located, and refusing to return the $150,000 after Thompson learned of his scheme and requested that his money be returned.

30. Fajerstein engaged in the conduct alleged above in the course of trade or commerce and did so intending to deceive or defraud Thompson.

31. Fajerstein's deceptive and unfair conduct has proximately caused Thompson's injury and damages.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract)

32. Thompson adopts and realleges the allegations contained in paragraphs 1 – 31 as though fully set forth herein.

33. Thompson and Fajerstein entered into a valid and enforceable contract for valuable consideration.

34. Thompson has at all times fulfilled his obligations under the contract.

35. Fajerstein's actions and omissions as alleged above breached the contract by, inter alia, failing timely to locate the diamond Thompson requested and to return Thompson's $150,000.

36. As a proximate result of Fajerstein's breach of contract, Thompson was injured and has suffered damages.

## THIRD CLAIM FOR RELIEF
### (Common Law Fraud)

37. Thompson adopts and realleges the allegations contained in paragraphs 1 – 36 as though fully set forth herein.

38. Fajerstein knowingly participated in the fraud scheme alleged herein or knowingly accepted the fruits of the fraudulent conduct.

39. With the intent to induce Thompson to wire money to Fajerstein, Fajerstein made untrue statements of material fact and omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, as alleged with particularity above.

40. At the time the misrepresentations and misleading statements were made to Thompson, Fajerstein knew these statements were false or misleading and intended to mislead Thompson by misrepresenting his services and misrepresenting the quality of the diamond he located.

41. In reasonable and justifiable reliance upon the false and misleading statements alleged herein, and unaware of the true facts, Thompson was induced to and did wire $150,000 to Fajerstein. Had Thompson known the truth, he would not have wired any money to Fajerstein.

42. As a direct and proximate result of this scheme to defraud, Thompson suffered damages in an amount to be determined at trial.

43. The acts alleged in this count were performed with malice, fraud, and gross negligence, and negate any mistake, honest error in judgment, overzealousness or mere negligence. In addition, the public interest would be served by the deterrent effect punitive damages would have upon the future conduct of Fajerstein and parties similarly situated. Accordingly, in addition to compensatory damages, Thompson is entitled to an award of punitive damages in an amount not less than $500,000.

**FOURTH CLAIM FOR RELIEF**
**(Conversion)**

44. Thompson adopts and realleges the allegations contained in paragraphs 1 – 43 as though fully set forth herein.

45. By virtue of Fajerstein's actions, as more fully alleged above, Fajerstein has appropriated Thompson's property for his own use and benefit in exclusion and defiance of Thompson's rights.

46. Thompson has an immediate, unqualified right to the funds he provided to Fajerstein in January 2008, and Thompson has made several demands that Fajerstein return his money.

47. Because Fajerstein's conversion of Thompson's property was accomplished through fraudulent means and reflects a willful, malicious and deliberate indifference to Thompson's rights, in addition to compensatory damages in an amount to be determined at trial, Thompson also seeks an award of punitive damages in an amount not less than $500,000 for Fajerstein's willful and malicious conversion.

## FIFTH CLAIM FOR RELIEF
### (Money Had and Received)

48. Thompson adopts and realleges the allegations contained in paragraphs 1 – 47 as though fully set forth herein.

49. Fajerstein has received money from Thompson under circumstances that, in equity and good conscience, he ought not be permitted to retain, and which money, according to what is equitable, belongs to the Thompson.

50. By virtue of the monies had and received by Fajerstein under the circumstances alleged herein, Fajerstein should not be permitted to retain those funds, and is liable to Thompson therefor.

## SIXTH CLAIM FOR RELIEF

### (Unjust Enrichment)

51. Thompson adopts and realleges the allegations contained in paragraphs 1 – 50 as though fully set forth herein.

52. As alleged herein, Thompson has conferred a measurable benefit upon Fajerstein, at the express request of Fajerstein, under such circumstances that retention of the benefit by Fajerstein without repayment would be unjust.

53. Fajerstein is liable to Thompson for all amounts unjustly conferred upon Fajerstein.

### REQUEST FOR RELIEF

**WHEREFORE**, Thompson prays this Court to:

(a) Enter judgment in favor of Thompson and against Fajerstein on all counts;

(b) Award compensatory and punitive damages to Thompson in an amount determined at trial;

(c) Order Fajerstein to pay Thompson prejudgment interest;

(d) Award Fajerstein the costs and expenses of this action, including reasonable attorney's fees and expenses, experts' fees and other costs and disbursement; and

(e) Grant such further and other relief as the Court finds just under the circumstances.

Respectfully submitted,

June 4, 2008

/s/   *Jay Williams*
Jay Williams
Lindsey L. Evans
SCHIFF HARDIN LLP
6600 Sears Tower
Chicago, IL 60626
312-258-5500

Attorneys for Plaintiff

```
08CV3240        NF
JUDGE KOCORAS
MAGISTRATE JUDGE MASON
```

# Exhibit A

Case 1:08-cv-03240  Document 1-2  Filed 06/04/2008  Page 1 of 4

*Thompson Reports*

01 Jan 08 - 31 Jan 08

Account number ███
THOMPSON FAMILY TRUST
Page 1 of 2

◆ **Funding and Disbursement Detail**

### Security Receipts

| Value Date Entry Date | Security Description | Transaction amount | Cost | Market value | Realized gain/loss Market Translation | Total |
|---|---|---|---|---|---|---|
| 25 Jan 08 25 Jan 08 | United States dollar TRANSFERRED VIA FED FUND WIRE TO NEW CENTURY BANK ACCT NAME: FAJERSTEIN DIAMOND IMPORTERS ACCT # ███ | -150,000.00 | 0.00 | | 0.00 0.00 | 0.00 |
| Total miscellaneous cash disbursements | | | 0.00 | | 0.00 | 0.00 |

### Interportfolio Transfers In

| Value Date Entry Date Asset ID | Security Description Transaction description | Transaction amount | Cost | Market value | Realized gain/loss Market Translation | Total |
|---|---|---|---|---|---|---|

*Generated by Northern Trust from daily data on 6 Mar 08   B006*

**Northern Trust**

# Exhibit B

**From:** Rick Thompson <rick@dogtime.com>
**Date:** Sat, 01 Mar 2008 10:32:50 -0700
**To:** Fajerstein Diamonds <fajersteindiamonds@msn.com>
**Conversation:** Payment schedule
**Subject:** Payment schedule

Ron,

Thank you for your call yesterday.   We'll both feel better when this is behind us.   I am writing this email to recap our agreement.

(a) It is agreed that you (Ron Fajerstein, Fajerstein Diamonds, Antwerp Diamonds) owe me (Rick Thompson) $150,000.00.
(b) It is agreed that you will make the first payment of $50,000.00 in the form of a wire to my bank account no later than March 5th, 2008
(c) It is agreed that you will make a second payment of $50,000.00 in the form of a wire to my bank account no later than April 5th, 2008
(d) It is agreed that you will make a final payment of $50,000.00 in the form of a wire to my bank account no later than May 5th, 2008

Please respond to this email acknowledging  our agreement to make sure there is no misunderstanding between us.

Best,
Rick