**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **RICHARD THOMPSON, Trustee of** | ) | |
| **The Thompson Family Trust** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 08 CV 03240** |
| | ) | |
| **vs.** | ) | **Hon. Charles P. Kocoras** |
| | ) | |
| **RONALD FAJERSTEIN, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

### THOMPSON'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS

Plaintiff Richard Thompson, as Trustee of the Thompson Family Trust ("Thompson"), by and through his attorneys, hereby submits his response to Defendants' Motion to Dismiss ("MTD" or "Motion").

## INTRODUCTION

Thompson filed his Complaint in this matter on June 4, 2008, alleging that he was swindled out of $150,000 by Defendants, and could have easily lost hundreds of thousands more as a result of Defendants' deceptive and fraudulent conduct.  In his six-count Complaint, Thompson asserted causes of action against Defendants for statutory and common law fraud, breach of contract, conversion, money had and received, and unjust enrichment.

In response, Defendants have filed a motion to dismiss the Complaint.  Although Defendants never deny the swindle or the fraud here (indeed, Defendants *concede* that "plaintiff sent the $150,000 deposit to defendant" [MTD at 10]), Defendants contend that Thompson has no claim for relief and that Thompson's lawsuit should be dismissed in its entirety.  According to Defendants, even if they breached their agreements and defrauded Thompson out of $150,000 as alleged (and conceded), the case should be dismissed because it has been brought in the wrong

forum, or because there *might* be other parties involved who could destroy diversity jurisdiction, or because the allegations are otherwise insufficient.

As demonstrated below, Defendants' Motion has no merit, particularly when evaluated in light of the liberal federal rules for notice pleading that govern here. Under those rules, Thompson has more than adequately pled his claims, and put Defendants on fair notice of what his claims are as well as the grounds upon which they rest. The Motion should be denied.

## LEGAL STANDARD

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), the Court must evaluate the complaint in the context of the liberal federal rules for notice pleading. *Heffernan v. Bass*, 467 F.3d 596, 598-99 (7th Cir. 2006). Rule 8(a) merely requires that a plaintiff provide a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a). As this Court has stated, "[t]he purpose of this minimum requirement to provide the defendant with fair notice of the plaintiff's claim and the grounds upon which it rests. *Bryant v. Oak Forest High School Dist. 228*, No. 06-5697, 2007 WL 2738544, at *2 (N.D. Ill. Sept. 12, 2007) (Kocoras, J.) (*citing Brown v. Budz*, 398 F.3d 904, 908 (7th Cir. 2005)).

Rule 12(b)(6) tests the legal sufficiency of a plaintiff's complaint, not the merits. *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir. 1990). In ruling on a motion to dismiss, a court must draw all reasonable inferences in favor of the plaintiff, construe all allegations of a complaint in the light most favorable to the plaintiff, and accept as true all well-pleaded facts and allegations in the complaint. *Bontkowski v. First Nat'l Bank of Cicero,* 998 F.2d 459, 461 (7th Cir.1993); *Perkins v. Silverstein,* 939 F.2d 463, 466 (7th Cir. 1991). To be cognizable, the factual allegations contained within a complaint must raise a claim for relief "above the speculative level" and "give the defendant fair notice of what the ... claim is and the grounds upon which it

2

rests". *Bell Atlantic Corp. v. Twombly*, --- U.S. ----, 127 S.Ct. 1955, 1964-65, (2007) (*quoting*

*Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *see also Payton v. Rush-Presbyterian-St. Luke's Med.*

*Ctr.*, 184 F.3d 623, 627 (7th Cir. 1999) (a pleading need only convey enough information to

allow the defendant to understand the gravamen of the complaint). Fraud claims must be pled in

accordance with the heightened specificity standard articulated in Rule 9(b) "in order to ensure

that plaintiffs are not able to make blithe allegations of fraud." *Power v. GMAC Mortg. Corp.*,

No. 06-4983, 2007 WL 723509, at *3 (N.D. Ill. March 7, 2007) (Kocoras, J.).[1]

Finally, under Rule 12(b)(1), "the plaintiff bears the burden of establishing subject matter

jurisdiction, and the Court may look beyond the allegations of the complaint to determine

whether subject matter jurisdiction exists." *Ptasinska v. United States Dep't of State*, No. 07C

3795, 2007 WL 3241560, at *2 (N.D. Ill. Nov. 1, 2007) (Kocoras, J.) (*citing Sapperstein v.*

*Hager*, 188 F.3d 852, 855 (7th Cir. 1999)); *see also United Transp. Union v. Gateway Western*

*Ry Co.*, 78 F.3d 1208, 1210 (7th Cir. 1996) (court may look beyond complaint and view any

extraneous evidence submitted by the parties to determine whether subject matter jurisdiction

exists). Dismissal should be denied "whenever it appears that a basis for federal jurisdiction in

fact exists or may exist and can be stated by Plaintiff." *Norfleet v. Vale*, No. 05 C 0926, 2005

WL 3299375, at *1 (N.D. Ill. Dec. 5, 2005). Based upon the applicable pleading standards set

forth above, Defendants' Motion falls woefully short. For these reasons as discussed more fully

below, the Motion should be denied in its entirety.

---

[1] In multiple defendant cases (like this), while the complaint must reasonably notify each defendant of his or her role in the fraud, *Midwest Grinding Co. v. Spitz*, 975 F.2d 1016, 1020 (7th Cir. 1992), this requirement is relaxed and "can be overlooked when [as here] defendants are related entities 'that can most likely sort out their involvement without significant difficulty'". *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1329 (7th Cir. 1994). *See* Compl. at ¶¶ 6, 8-11; MTD, Affidavit of Ronald M. Fajerstein.

**ARGUMENT**

**I.    <u>Thompson's Complaint Properly Alleges Diversity Jurisdiction In This Matter</u>.**

Defendants do not dispute that the Complaint adequately alleges diversity jurisdiction by stating that Thompson is a trustee of the Thompson Family Trust and he maintains his principal residence in Atherton, California.  (MTD 1-3; Compl. ¶ 7); 28 U.S.C. § 1332.  In their Motion, Defendants contend the court lacks jurisdiction under Rule 12(b)(1) based on the bare *possibility* that there *may* be a necessary party who *may* defeat diversity jurisdiction.  (MTD 2-3) Defendants' argument is pure speculation and fails to consider the requirements for identifying necessary parties and determining whether those hypothetical parties must be joined under Rule 19.[2]

Trustees are not automatically necessary and indispensable parties to any litigation involving a trust. *See, e.g., Culbertson Corp. v. Libco*, 983 F.2d 82, 85 (7th Cir. 1993) (finding trustee was not indispensible under Rule 19); *Terrydale Liquidating Trust v. Barness,* 645 F.Supp. 920, 924 (S.D.N.Y 1986) (same); *Limouze v. M. M. & P. Maritime Adv., Training, Ed. and Safety Program,* 397 F.Supp. 784, 791 (D.C.Md. 1975).  Rather, the court will consider whether a co-trustee must be joined using the two part analysis in Rule 19.  First, the court considers whether:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

---

[2] Indeed, Defendants can only make this argument by ignoring what is actually *alleged* by Thompson (which is all that really matters here) and focusing instead on their own fanciful speculation about what *might* be the case.  *See* MTD at 3 ("Does [the Northern Trust check] mean that Mr. Thompson maintains an account in Illinois and does not live in Illinois, or that Northern Trust is a co-Trustee of the trust?").

Fed. R. Civ. P. 19(a)  If the court determines that a party is necessary through the first inquiry, then the court "must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed".  Fed. R. Civ. P. 19(b)

The Rule 19 factors indicate that a co-trustee is not a necessary party to this case because Thompson only seeks to obtain the $150,000 that Defendants are wrongfully holding.  A trustee's absence as a co-plaintiff would not impair Thompson's ability to protect the trust or leave any existing party susceptible to inconsistent obligations. This case does not involve any allegations of potential liability for a co-trustee or allegations challenging the validity of the trust, which would require a co-trustee to participate.  *See, e.g.*, *Godfrey & Williams v. Kamin*, No. 99-3230, 1999 WL 756151, at *2 (N.D. Ill. Sept. 13, 1999) (breach of the trust); *Gross v. Gross*, No. 96-6203, 1996 WL 741968, at *2 (E.D. Pa. Dec. 18, 1996) (plaintiff sought to declare the trust invalid); *Hinsdale v. Farmers Nat'l Bank & Trust*, 93 F.R.D. 662, 664-66 (N.D. Ohio 1982) (co-trustee might share in liability and there were no other litigants to assert her interests).

The claims in this case simply do not implicate any liability on behalf of a trustee and do not require the addition of a co-plaintiff under Rule 19.  Moreover, and to remove all doubt that there may be a co-trustee that would destroy diversity jurisdiction in this case, Thompson provides the affidavit attached hereto as Exhibit A verifying that the only co-trustee is Thompson's wife, who is also a California resident.

## II.    There Is No Applicable Forum Selection Clause.[3]

In a particularly sly (and disingenuous) venue argument, Defendants quote misleadingly and selectively from an inoperative "contract", asserting that it requires Thompson to bring these

---

[3] In the Complaint Thompson asserts a breach of contract claim that is separate and distinct from the invoice Defendants attached to their motion to dismiss.

5

claims elsewhere.  However, the "agreement" Defendants rely on is an invoice Fajerstein sent to

Thompson, and its terms are *expressly* conditioned on *receipt* of certain merchandise:

> ***Your receipt of the merchandise described on this document constitutes your agreement*** to pay the total amount indicated for each item described hereon to Fajerstein Diamond Importers and Cutters, Inc. (FDIC) within 30 days of receiving said items.  ***The recipient of the merchandise described herein agrees*** to pay all of FDIC's costs, including court costs, interest (18% per annum to begin accruing after 30 days), reasonable attorneys' fees and any and all other ancillary expenses, in the event it is necessary for FDIC to enforce its rights hereunder.  ***Recipient [of the merchandise]*** further consents to the jurisdiction of the Circuit Court of Cook County, Illinois and agrees that any rights and responsibilities set forth in this document shall be adjudicated in the Circuit Court of Cook County, Illinois.  ***Recipient [of the merchandise]*** hereby waives the right to a trial by jury.  ***Receipt of the merchandise described hereon constitutes your agreement to these terms***, which represent the parties' entire contract with regard to the merchandise hereon described and which cannot be varied by oral statements, dealings with respect to other merchandise or any contrary custom of the trade. (emphasis added)

A condition precedent is an act or event that must occur before a duty of performance

arises. *Hardin, Rodriguez & Bolvin Anesthesiologists, Ltd. v. Paradigm Ins. Co.*, 962 F.2d 628,

633 (7th Cir. 1992); s*ee e.g*, *Cobra Capital LLC v. Stover Industries, Inc.*, No. 06 – 2882, 2007

WL 844635, at *3 (N.D. Ill. March 14, 2007) (finding phrase "payment shall be due upon

delivery" unambiguously conditions the obligations upon delivery of the merchandise).  Both

parties to a contract must agree to a condition precedent before it becomes binding.  *Hardin*, 962

F.2d at 633.  If a condition precedent does not occur, a contract is not formed and its provisions

are not binding on either party.  *ICF Credit Corp. v. Burton Industries, Inc.*, No. 07-2768, 2008

WL 2908754, at *4 (7th Cir. July 30, 2008) (finding company not obligated to make lease

payments on equipment it never received because receipt of merchandise was a condition

precedent).

The affidavit Fajerstein filed in support of the Motion indicates that he sent the invoice to

Thompson, but it does not state that he ever satisfied the condition precedent - delivery of the

merchandise. More importantly, the Complaint alleges *exactly the opposite* and states that the merchandise was *never* received. (Compl. ¶¶ 1, 16-22). Yet Defendants now ask the Court, based upon a less-than-candid presentation of the supposed "agreement" they attach, to enforce these provisions merely because Fajerstein claims this document was mailed to Thompson. Since there is no allegation that Thompson ever received *any* merchandise, let alone the merchandise described on the invoice, the invoice cannot constitute a valid contract and its purported "forum selection clause" is completely irrelevant to this action.

**III.    Thompson Properly Alleges a Claim Under the Illinois Consumer Fraud & Deceptive Business Practices Act.**

To state a claim under the Illinois Consumer Fraud And Deceptive Business Practices Act ("ICFA"), a plaintiff must allege: (1) a deceptive act or unfair practice by the defendant; (2) that the defendant intended that the plaintiff rely on that act or practice, or intent by the defendant to deceive, defraud, or be unfair to the plaintiff; (3) that the deception or unfair practice occurred in the course of conduct involving trade and commerce; and (4) that the deceptive act or unfair practice proximately caused the plaintiff's injury. *Avery v. State Farm Mut. Auto. Ins. Co.,* 216 Ill.2d 100, 180 (2005).

**A.    As Thompson alleges, the circumstances that relate to the disputed transaction occurred primarily in Illinois.**

A plaintiff does not need to be physically present in Illinois to state an ICFA claim. *Id.* at 187. Rather, the circumstances that relate to the disputed transaction must occur primarily and substantially in Illinois. *Id.* The court will consider the following when determining whether a transaction occurs "primarily and substantially" in Illinois: (i) plaintiff's residence, (ii) where the deception occurred, (iii) where the damage to plaintiff occurred, and (iv) whether plaintiff communicated with defendants or its agents in Illinois. *IFC Credit Corp. v. Aliano Bro. General Contractors, Inc.*, No. 07-2768, 2007 WL 164603, at *3 (N.D. Ill. 2007).

7

Nearly all of the allegations contained in the Complaint relate to activity that occurred in Illinois. Although Thompson lives in California and the parties first met there, the following activities took place in Illinois: Fajerstein operated his diamond business in Illinois and had an office in Chicago; Thompson contacted Fajerstein in Illinois and inquired about purchasing a diamond; after Fajerstein made several fraudulent and deceptive representations while in Illinois to Thompson, Thompson wired $150,000 to Fajerstein's account in Illinois; Fajerstein also requested that Thompson wire an additional $300,000 to him in Illinois; Thompson's $150,000 is currently in Fajerstein's possession in Illinois. (Compl. ¶¶ 7-27) The transaction at issue certainly occurred primarily and substantially in Illinois, where the Defendant was located, where the misrepresentations were made, and where the missing $150,000 was sent.

**B.      Thompson properly asserts an ICFA claim because the Complaint alleges that Defendants lied in order to induce Thompson to wire $150,000.**

Defendants also assert that Thompson has no claim under the ICFA because the Complaint merely reflects a breach of contract. Thompson alleges a claim under the ICFA for a series of deceptive acts by which Defendants actually obtained $150,000 of Thompson's money, and attempted to obtain an additional $300,000 more. Thompson is not merely alleging that Defendants failed to perform on the contract, nor is he seeking to recover for "puffing" or for the statements Fajerstein made concerning the description of the diamond he (supposedly) located. Rather, Thompson alleges that Defendants' conduct was misleading and deceptive because Defendants misrepresented their services, induced Thompson to wire Defendants money, misrepresented the existence and/or quality of the diamond they (supposedly) located, misrepresented that they would pay the money back, and refused to return the $150,000 after Thompson learned of his scheme and requested that his money be returned. (*See* Compl. ¶¶ 12-27, 29-30) These allegations create a cognizable ICFA claim because Defendants lied in order to

induce Thompson to enter into a contract and they continued to deceive Thompson throughout the transaction. *See Central DuPage Health v. 3M Co*., No. 05-0241, 2005 WL 2848396, at *4 (N.D. Ill. Oct. 26, 2005) (denying motion to dismiss ICFA claim when misrepresentations were made in connection with a contract); *Lindsey v. Ed. Johnson Oldsmobile, Inc.*, No. 95 – 7306, 1996 WL 411336, at *5 (N.D. Ill. July 19, 1996) (Kocoras, J.) (same).

The Complaint also properly alleges that Thompson was deceived by Fajerstein's statements and says that "in reliance on Fajerstein's representations, Thompson wired $150,000 to Fajerstein for the purpose of purchasing the specific diamond he requested in his conversation with Fajerstein." (Compl. ¶ 16). The Complaint alleges that Thompson eventually began to catch on to Fajerstein's scheme, but it wasn't until after Fajerstein had already taken his $150,000. (Compl. ¶ 41) Had Thompson known that Fajerstein was lying to him, *e.g.*, that he would not obtain the stone and would not return the money, Thompson would not have wired the money to him in the first place. (Compl. ¶ 41)

**C.    Defendant's conduct constitutes an "unfair" practice under the ICFA.**

Conduct is "unfair" under the ICFA if it: (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous or (3) causes substantial injury to consumers. *Windy City Metal Fabricators & Supply, Inc.*, No. 07-1567, 2008 WL 2941171, at *4 (7th Cir. Aug. 1, 2008). A court may find unfairness under the ICFA even if the conduct does not satisfy all three criteria. *Id.*

Here, Thompson adequately alleges all three elements of an unfair practice. The Complaint describes Defendants' unethical and unscrupulous practice of coaxing money out of consumers such as Thompson and using the money for their own purposes without ever providing (nor intending to provide) any merchandise. (Compl. ¶¶ 1-3, 15-24) The Complaint also indicates that Fajerstein's practice inflicts substantial financial injury to consumers – in this

9

case Fajerstein conned $150,000 out of Thompson and, as soon as he received those funds, he attempted to pressure Thompson to send additional money. (Compl. ¶¶ 16-18, 23) These deceptive and misleading tactics offend public policy and are precisely the types of circumstances that the ICFA was intended to rectify.

**IV.    Defendants Fail To Provide A Basis Under Rule 12(b)(6) Or Otherwise For Dismissing Thompson's Breach Of Contract Claim.**

Although Defendants purport to move for dismissal of Thompson's contract claim under Rule 12(b)(6), the basis for their motion here is unclear, if not incomprehensible. *See* MTD at 9. For example, Defendants do not identify any unpled elements of a breach of contract claim, nor do they specify any other respect in which Thompson's allegations are deficient or lacking in this regard. Indeed, Defendants do little more than "rely on their [previous jurisdiction and venue] arguments". *Id.* In any event, because those "previous arguments" have no merit (*see* Sections I-II above), and because Defendants elsewhere appear to *concede* that Thompson's allegations state a breach of contract claim (*see* MTD at 12-13 ["[t]he essence of this case is a breach of contract case"]), Defendants' Motion should be denied.

**V.    Thompson States A Claim For Fraud Because He Alleges That Fajerstein Lied In Order To Obtain $150,000 From Him.**

The Complaint properly states a claim for promissory fraud because it alleges facts sufficient to show that Fajerstein was engaged in a scheme to defraud. While it is true that misrepresentations of intention to perform future conduct, even if made without a present intention to perform, generally do not constitute fraud, the Illinois Supreme Court has recognized an exception to that rule and held that a plaintiff can state a claim for fraud if "the false promise or representation of future conduct is alleged to be the scheme employed to accomplish the

fraud." *HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145, 168, 545 N.E.2d 672, 682 (Ill. 1989).[4]

A scheme to defraud exists when a party "makes a promise of performance, not intending to keep the promise, but intending for another party to rely on it, and where the other party relies to his detriment." *Bower v. Jones*, 978 F.2d 1004, 1011 (7th Cir. 1992) (quoting *Concord Industries, Inc. v. Harvel Industries Corp.* 122 Ill.App.3d 845, 849, (1st. Dist. 1984)). Allegations may support a scheme to defraud where a defendant: (1) lies repeatedly to one promisee; or (2) lies at least once to multiple promisees. *See, e.g., HPI,* 545 N.E.2d at 681-82; *Steinberg v. Chicago Med. Sch.,* 69 Ill.2d 320, 332 (1977). The Complaint in this case alleges both.

The Complaint alleges that Fajerstein lied to Thompson in order to induce Thompson to wire him $150,000, Thompson sent the money to Fajerstein in reliance on those promises, and Fajerstein used that money exclusively for his benefit. (Compl. ¶ 40-42) The Complaint specifically states that Fajerstein lied about his intent to use Thompson's money for the agreed purpose, his ability to obtain the specified stone on the specified date, and his intention to obtain the specified stone on the specified date. (Compl. ¶ 15) Thompson also alleges that Fajerstein later lied about the existence and/or quality of diamond he (supposedly) procured and inflated the price of the diamond he obtained. (Compl. ¶¶ 17, 21) Fajerstein perpetuated this scheme by further lying about the possibility of returning Thompson's money, first saying that he said that he had purchased another diamond and was not able to return the money, later saying that he would be able to return it if Thompson paid a restocking fee, and eventually saying that he would

---

[4] In support of their assertion that Thompson fails to state a claim for fraud, Defendants rely on several cases which stand for the unremarkable proposition that a complaint must state allegations sufficient to show a scheme to defraud in order to maintain a claim for promissory fraud. (MTD 11-12)

pay a portion of the money within six days. (Compl. ¶¶ 23, 25, 26)   Despite all of these representations, Thompson has still failed to return Thompson's money. (Compl. ¶ 27)

Not only does the Complaint allege that Fajerstein repeatedly lied to Thompson, but it also alleges that Fajerstein has repeatedly lied to others in connection with his diamond business. (Compl. ¶ 1).  Several other cases have been filed against Fajerstein on the basis that Fajerstein lied in order to solicit funds and later kept the funds without providing the agreed diamond.  In a similar case filed in Cook County, a plaintiff alleged that Fajerstein lied about the quality of the diamond, obtained a "deposit" from the plaintiff and then refused to return the plaintiff's money.[5] (*Skaltsas* Complaint ¶¶ 4-22, attached hereto as Exhibit B).  A RICO complaint filed in the Northern District of Illinois alleges that on several different occasions, Thompson deceptively solicited funds from individuals claiming that he would use the funds to purchase certain diamonds, but he never delivered the diamonds and retained the their money.  (*LaSalle Investments* Complaint ¶¶ 31-40, attached hereto as Exhibit C).

Although Defendants attempt to recast the events innocently as a mere breach of contract (MTD at 11-12), the allegations of Fajerstein's knowing inducement, retention of Thompson's money and false statements concerning repayment of the debt clearly constitute promissory fraud.  At its core, Thompson's claim here is based upon allegations of Defendants' lies and misrepresentations, not Defendants' mere contractual non-performance.  *See Air Tiger Express v. Barclay*, No. 08-1945, 2008 WL 3153333, at *3 (N.D. Ill. 2008) (denying a motion to dismiss a promissory fraud claim because defendant induced plaintiff to deliver goods by falsely representing that it would pay for goods, failed to pay for the goods, and then later compounded the misrepresentation by saying that the check was in the mail); *Pulphus v. Sullivan*, No. 02-

---

[5] The court may take judicial notice of documents in the public record. *Pugh v. Tribune Co.*,  521 F.3d 686, 691 n.2 (7th Cir. 2008).

5974, 2003 WL 1964333, at *19 (N.D. Ill. 2003) (holding plaintiff stated a claim for promissory fraud by alleging that defendant induced plaintiff to take out two mortgages on her home for remodeling, did minimal work on her home, and refused to return $75,000).

## VI. Thompson Properly States A Claim For Conversion.

To state a claim for conversion under Illinois law, Plaintiff must allege that (1) the plaintiff has an absolute and unconditional right to possession of the property; (2) the defendant asserted unauthorized assumption of control or ownership over the property; and (3) the plaintiff made a demand for the property. *Hydra-Stop, Inc. v. Severn Trent Environmental Services, Inc.*, No. 03-4843, 2003 WL 22872137, at *4 (N.D. Ill. 2003) (Kocoras, J.)

Thompson has properly alleged all of these elements by stating that Fajerstein did not obtain the diamond he requested, and Thompson is owed the $150,000 "deposit" he sent to Fajerstein. (Compl. ¶¶ 20-27)  The Complaint also alleges that Fajerstein is currently exercising control over the property, even though Thompson has made several demands that this amount be returned. (*Id.*)  Relying on a case decided under Indiana law, Defendants claim that there is simple debtor/creditor relationship between the parties, therefore Thompson has no conversion claim. (MTD at 13.)  However, under Illinois law, taking money by false promises and refusing to return it states a proper claim for conversion and does not constitute a debtor/creditor relationship. *Firststar Bank, N.A. v. Faul*, No. 00 C 4061, 2001 WL 1636430, at *7 (N.D. Ill. Dec. 20, 2001) (rejecting the claim that a debtor-creditor relationship existed under Illinois law when plaintiff transferred the money under false pretenses).

Thompson also alleges a proper conversion claim by specifying the funds that were transferred to Fajerstein.  Money which is "segregated from other funds, received in a lump sum, earmarked, or otherwise identifiably distinct" can be characterized as specific chattel and is the proper subject of a conversion claim. *Horbach v. Kaczmarek*,  288 F.3d 969, 977-978 (7th Cir.

2002); *Hydra-Stop, Inc.*, 2003 WL 22872137, at *4 (denying motion to dismiss conversion claims seeking two identifiable sums of money); *Firstar Bank*, 2001 WL 1636430, at *7 (finding a proper claim for conversion based on plaintiff's allegations that defendant converted $426,604). In this case, Thompson specified the funds at issue by alleging the specific sum and attaching the wire transfer Thompson made to Fajerstein's account as Exhibit A to the Complaint. (Compl. ¶ 16)

### VII.     Thompson May Plead Equitable Claims And Breach Of Contract Claims In The Alternative at This Stage Of The Litigation.

While a plaintiff ultimately cannot recover for the same activity under both a breach of contract theory and an equitable theory, Rule 8(d) permits a plaintiff to plead these claims in the alternative. *Rose Importing & Distributing, LLC v. Seesaw, Inc.*, No. 06-3623, 2007 WL 551572 (N.D. Ill. Feb. 21, 2007) (denying motion to dismiss equitable claims pled along with breach of contract claims).

Thompson alleges a breach of contract claim as well as equitable claims for money had and received and unjust enrichment because, at this stage of the litigation, Thompson lacks information on which claims may be brought against which parties. Without discovery, Thompson cannot determine which defendant(s) Thompson contracted with concerning the diamond for purposes of the breach of contract claim, and which defendant(s) currently holds Thompson's money for purposes of the equitable claims.

Defendants argue that Thompson's equitable claims must be dismissed based on cases finding that equitable claims are no longer necessary once the court or the parties have resolved that a valid contract covers the transaction. *See, e.g., Prima Tek II, LLC v. Klerk's Plastic. Indust.*, 525 F.3d 533, 540-41 (7th Cir. 2008); *Keck Garrett & Assoc. v. Nextel Comm., Inc.*, 517 F.3d 476, 487 (7th Cir. 2008); *Rossi Distributors, Inc. v. Lavazza Premium Coffees Corp.*, No.

01-9271, 2002 WL 31207324, at *4 (N.D. Ill. Oct. 2, 2002) ("both Rossi and Lavazza agree that there was a valid contract that governed their rights").  In these cases, the extra-contractual claims were dismissed because there was *no dispute* that there was a valid contract governing the parties' relationships. Here, there is a dispute:  Defendants have not unequivocally conceded that the contract alleged by Thompson was a valid contract binding all parties to this action.  Indeed, Defendants claim that the "Invoice" attached to Mr. Fajerstein's Affidavit constitutes the parties' agreement (notwithstanding the necessary precondition that was never met).  *See* Section II above.  Therefore, Thompson properly put forth both contract and equitable claims at the pleading stage.[6]  *See Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 397 (7th Cir. 2003) ("A party is allowed to plead breach of contract, or if the court finds no contract was formed, to plead for quasi-contractual relief in the alternative").

WHEREFORE, for the foregoing reasons, Plaintiff Richard Thompson respectfully requests that the Court deny Defendants' Motion to Dismiss in its entirety.

August 14, 2008                                   Respectfully submitted,

                                                   _/s/    Jay Williams_____
                                                  Jay Williams
                                                  Lindsey L. Evans
                                                  SCHIFF HARDIN LLP
                                                  6600 Sears Tower
                                                  Chicago, IL 60626
                                                  312-258-5500

                                                  Attorneys for Plaintiff

---

[6] In the event the Court determines that there are any pleading deficiencies with regard to these claims pursuant to *Murray v. ABT Assoc., Inc.*, No. 926 3898, 1992 WL 229552, at *8 (N.D. Ill. Sept. 11, 1992) (Kocoras, J.), or any other claims, Thompson respectfully requests an opportunity to amend his complaint. Fed. R. Civ. P.15(a).  Particularly at such an early stage in the case, the standard for amending a pleading is a liberal one, and leave to amend should be freely granted when justice so requires.  *See, e.g., Foman v. Davis*, 371 U.S. 178 (1962); *Holstein v. Brill*, 987 F.2d 1268, 1270 (7th Cir. 1993).

# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| RICHARD THOMPSON, Trustee of<br>The Thompson Family Trust | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08 CV 03240 |
| | ) | |
| vs. | ) | Hon. Charles P. Kocoras |
| | ) | |
| RONALD FAJERSTEIN,<br>FAJERSTEIN DIAMOND IMPORTERS<br>& CUTTERS, INC., and ANTWERP<br>DIAMOND IMPORTERS &<br>CUTTERS, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF RICHARD THOMPSON

I, Richard Thompson, hereby state as follows:

1. I offer this declaration based upon my personal knowledge and information.

2. I am a trustee of the Thompson Family Trust.

3. My wife, Rhona Thompson is also a trustee of the Thompson Family Trust. She lives with me in Atherton, California.

4. We are the only co-trustees of the Thompson Family Trust.

I declare under penalty of perjury that the foregoing is true and accurate.

Dated: August 13, 2008

_____
Richard Thompson

Exhibit B

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, MUNICIPAL DIVISION

| | |
|---|---|
| JOHN SKALTSAS, an individual, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Court no.: |
| ) | |
| RONALD FAJERSTEIN, an individual, and ) | Plaintiff Demands Trial |
| FAJERSTEIN DIAMOND IMPORTERS ) | by Jury |
| & CUTTERS, INC., an Illinois Corporation, ) | |
| ) | |
| Defendant. ) | |

**COMPLAINT FOR FRAUD, CONVERSION, AND VIOLATION OF THE
ILLINOIS CONSUMER FRAUD AND DECEPTIVE PRACTICES ACT**

Now comes Plaintiff, Mr. John Skaltsas, by his attorneys, Law Offices of

Peter S. Stamatis, P.C., and for his complaint against Ronald Fajerstein and

Fajerstein Diamond Importers & Cutters, Inc., states as follows:

**Preliminary Statement**

Defendants, diamond salesmen, lied to plaintiff about the quality of a

diamond, accepted $6000 to hold the diamond, and then, after plaintiff

uncovered their lies, refused to his return the money. In this action, plaintiff asks

this court to give life to the ancient instructions of Amenemope:

*If riches come to you by theft,
They will not stay the night with you*

## The Parties

1.     John Skaltsas, plaintiff, is an individual and a resident of the City of Chicago, County of Cook, State of Illinois.

2.     Ronald Fajerstein, defendant, is on information and belief, an individual and a resident of City of Chicago, County of Cook, State of Illinois.

3.     Fajerstein Diamond Importers & Cutters, Inc. ("FDIC") is an Illinois Corporation with its principal place of business at 67 East Madison Street, Suite 1730 Chicago, Illinois 60603.  On information and belief, Fajerstein is the sole shareholder of FDIC.

## Background Information

4.     On or about April 21, 2006, Mr. Skaltsas went to FDIC to purchase an engagement ring.

5.     There, he met with Ronald Fajerstein ("Fajerstein") and FDIC staff. Fajerstein showed Mr. Skaltsas a number of diamonds.

6.     One of the diamonds Fajerstein showed Mr. Skaltsas was one Fajerstein claimed was 2.01 carat "round brilliant cut" with "excellent" proportions, photoluminescence "slight," Depth 62.9%, Measurements 8.05 x 7.96 x 5.04mm, SI2 purity and Color grade D (the "2.01 Carat Diamond").  Fajerstein said that the 2.01 Carat Diamond cost $10,500.  Fajerstein showed Mr. Skaltsas an

EGL Certificate he claimed accurately confirmed the properties of this diamond (the "Fajerstein EGL Certification").

7.    When asked if he wanted to purchase any diamond, including the 2.01 Carat Diamond, Mr. Skaltsas told Fajerstein he wanted to think about it and left FDIC without buying anything.

8.    From April 25 to April 26, FDIC associate Susan Tomczak ("Tomczak"), not a party to this action, called Mr. Skaltsas at least three times telling him that Skaltsas quickly "needed to make a decision" as to whether he was interested in purchasing one of the diamonds Fajerstein had shown him on April 21, specifically the 2.01 Carat Diamond.  Tomczak claimed that a level of urgency was created because there were purportedly other parties interested in purchasing the 2.01 Carat Diamond.

9.    Tomczak further claimed that she could hold the 2.01 Carat Diamond for Mr. Skaltsas only if Mr. Skaltsas gave her a $6000 to show her boss Fajerstein, who she claimed was in Antwerp, Belgium, that Mr. Skaltsas was "serious" about making a purchase. Skaltsas told Tomczak that he was considering purchasing the 2.01 Carat Diamond, would tender the $6000 to "hold" the diamond, but that he wouldn't make a final decision concerning actually purchasing it until he first had it evaluated by an independent gemologist and discussed the particulars with Fajerstein. Tomczak agreed.

3

10.    On or about April 25, 2006 Tomczak faxed Mr. Skaltsas the Fajerstein EGL Certification.    Tomczak reiterated that the Fajerstein EGL Certification accurately described the properties of the 2.01 Carat Diamond.    A copy of the Fajerstein EGL Certification is attached hereto as *Exhibit A.*

11.    On or about April 27, 2006, Mr. Skaltsas tendered Tomczak a $6,000 check payable to FDIC to hold the 2.01 Carat Diamond.    A copy of the cancelled check attached hereto as *Exhibit B.*

12.    At or about that same time, Mr. Skaltsas asked Tomczak when Fajerstein was to return to Chicago from Belgium.    Skaltsas then scheduled an appointment with Tomczak to meet with Fajerstein to further discuss the transaction and to have the diamond independently evaluated.

13.    At that time, Mr. Skaltsas reiterated to Tomczak that he refused to purchase the diamond until he first had the independent evaluation to confirm the accuracy of the Fajerstein EGL Certification.

14.    On May 2, 2006, Mr. Skaltsas met with Fajerstein at FDIC.    An associate of Fajerstein and Mr. Skaltsas then walked upstairs to Professional Gem Services (PGS) for the professional analysis.    Fajerstein's associate then tendered to PGS the 2.01 Carat Diamond and then left.    Mr. Skaltsas waited in PGS's waiting room.

4

15.    Over the next several hours PGS evaluated the 2.01 Carat Diamond's color, cut and clarity.  PGS made a number of conclusions, the sum and substance of which is that the Fajerstein EGL Certification was, with the exception of the weight of the 2.01 Carat Diamond, fraudulent.   A copy of the PGS Evaluation of the 2.01 Carat Diamond is attached hereto as *Exhibit C.*

16.    Then and there, Mr. Skaltsas decided he would not purchase the 2.01 Carat Diamond or any diamond from Fajerstein and/or FDIC.  Over the next few days, Skaltsas left Fajerstein at least three voice mails telling him he would not purchase the diamond and that he wanted his $6000 returned.   When Fajerstein finally responded to Skaltsas' call, Fajerstein began yelling at Mr. Skaltsas, saying that he "couldn't believe" what he was hearing.   Fajerstein claimed he was "insulted," that he had "never had any problems" with anyone, and that he had "bent over backwards" for Mr. Skaltsas.  He further claim that all he wanted was "the best" for Mr. Skaltsas' fiancé.

17.    After being berated, Mr. Skaltsas told Fajerstein that he would agree to buy a diamond from Fajerstein, so long as the diamond that he was purchasing was the diamond represented on the Fajerstein EGL Certification.

18.    Fajerstein replied, "You're nuts!   That diamond is worth at least $25,000."

19.    Mr. Skaltsas then told Fajerstein that he simply wanted his $6,000 to be returned to him. Fajerstein refused.

20.    On May 4, 2006, Mr. Skaltsas once again called Fajerstein asking for the return of his $6,000.

21.    Fajerstein once again yelled at Mr. Skaltsas and told Mr. Skaltsas that if he wanted his money back, he should hire a lawyer.

22.    To date, Fajerstein has refused to return the $6,000.

<u>Count I</u>
<u>Consumer Fraud</u>

1.-22. Plaintiff adopts and realleges the allegations contained in paragraphs 1-22 as though fully set forth herein.

23.    At all times relevant, there was in full force and effect a statute commonly known as the Consumer Fraud and Deceptive Practices Act (815 ILCS 505/2) which provides in pertinent part as follows:

Unlawful Practices-Construction with Federal Trade Commission Act:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use of employment of misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use of employment of any practice described in section 2 of the Uniform Deceptive Trade Practices Act, approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be

6

given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

24.    The Consumer Fraud and Deceptive Business Practices Act further provides that in any action brought by a person under this Section, the Court may award, in addition to the relief provided in this Section, <u>reasonable attorney's fees and costs to the prevailing party.</u>

25.    Fajerstein, individually and as agent of FDIC and FDIC, violated the Consumer Fraud and Deceptive Practices Act when they, among other things:

    a.    lied about the quality of the 2.01 Carat Diamond;

    b.    produced an EGL Certificate that significantly and materially exaggerated the quality of the 2.01 Carat Diamond;

    c.    refused to return Mr. Skaltsas' $6,000 after Mr. Skaltsas learned about Fajerstein and FDIC's misrepresentation;

    d.    created or directed someone to create a fraudulent EGL Certificate relative to the 2.01 Carat Diamond.

    e.    otherwise violated the Act.

Wherefore, Plaintiff, Mr. John Skaltsas, respectfully requests this Honorable Court enter judgment in his behalf and against defendants' Fajerstein and FDIC, and award him the follows:

    a)    Compensatory damages in the amount of $6,000;

7

b)    Punitive damages in an amount in excess of $25,000, an amount sufficient to punish defendants for their actions and to deter them from engaging in such conduct in the future;

c)    Attorneys fees plaintiff incurred in prosecuting this action; and

d)    Such other relief as this Honorable Court deems appropriate.

## Count II
## Common Law Fraud

1.-25. Plaintiff adopts and realleges the allegations contained in paragraphs 1-25 as though fully set forth herein.

26.    Defendants and their agents above representations to plaintiff relative to the quality of the diamond were representations of material fact.

27.    At all relevant times hereto, defendants knew or believed those representations were untrue.

28.    Plaintiff had a right to and did rely on defendants' statements.

29.    The representation was made for the purpose of inducing Mr. Skaltsas to pay FDIC $6000 and then to purchase the 2.01 Carat Diamond.

30.    As a result of defendants' misrepresentations, Mr. Skaltsas was damaged in that he tendered $6,000 to FDIC.

Wherefore, Plaintiff, Mr. John Skaltsas, respectfully requests this Honorable Court enter judgment in his behalf and against defendants' Fajerstein and FDIC, and award him the follows:

a)    Compensatory damages in the amount of $6,000;

b)    Punitive damages in an amount in excess of $25,000, an amount sufficient to punish defendants for their actions and to deter them from engaging in such conduct in the future;

c)    Attorneys fees plaintiff incurred in prosecuting this action; and

d)    Such other relief as this Honorable Court deems appropriate.

## Count III
## Conversion

1-30.    Plaintiffs adopt and re-allege the allegations contained in paragraphs 1-30 as though fully set forth herein.

31.    Fajerstein, individually and as agent for FDIC., has exercised an unauthorized and wrongful assumption of control, dominion, and/or ownership over Mr. Skaltsas $6,000.

32.    Mr. Skaltsas, as the owner of the $6,000, has an ownership right in his money.

33.    Mr. Skaltsas has the right to immediate possession of his $6,000.

34.    Repeatedly from May, 2006 to the present, Mr. Skaltsas and his attorneys have requested return of this $6,000 from Fajerstein and FDIC. Though they have promised to return the money, they have repeatedly reneged and/or refused to honor such promises.

WHEREFORE, Plaintiffs respectfully requests this Court enter judgment in their favor and grant them the following relief:

9

a)    Compensatory damages in the amount of $6,000;

b)    Punitive damages in an amount in excess of $25,000, an amount sufficient to punish defendants for their actions and to deter them from engaging in such conduct in the future;

c)    Attorneys fees plaintiff incurred in prosecuting this action; and

d)    Such other relief as this Honorable Court deems appropriate.

10/30/06

Respectfully submitted,

One of Mr. Skaltsas' lawyers

Peter S. Stamatis
Law Offices of Peter S. Stamatis, PC
77 West Wacker Drive
Suite 4800
Chicago, Illinois 60601
Telephone:  312 606-0045
Facsimile:  312 606-0085
Attorney code:  33795

10

Exhibit C

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| LA SALLE INVESTMENTS, INCORPORATED, an Illinois corporation & ROBERT T. GERAS, <br><br> Plaintiffs, <br><br> v. <br><br> RONALD FAJERSTEIN, KYLA FAJERSTEIN, FAJERSTEIN DIAMOND IMPORTERS & CUTTERS, INC., an Illinois corporation, TAL LANDAU, SUSAN PIERCE TOMCZAK, LAURY ROSE, CANDLELIGHT JEWELRY, INC., an Illinois corporation & STANI VAN BLERK <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No.: 06 C 6193 <br><br> **Judge John W. Darrah** <br> **Magistrate Judge Denlow** <br> **JURY DEMANDED** |

### FIRST AMENDED COMPLAINT

NOW COMES Plaintiffs Robert T. Geras and LaSalle Investments, Incorporated, an Illinois corporation, by and through their attorneys, Robert H. Itzkow, Timothy S. Buckley, Scott M. Levin and Matthew C. Wasserman, as and for their First Amended Complaint against Defendants Ronald Fajerstein, Kyla Fajerstein, Fajerstein Diamond Importers & Cutters, Inc., an Illinois corporation, Tal Landau, Susan Pierce Tomczak, Laury Rose, Candlelight Jewelry, Inc., an Illinois corporation, and Stani Van Blerk (collectively, "Defendants"), state as follows:

### JURISDICTION AND VENUE

1.     This is an action for violations arising under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961, *et. seq.*, and violations of Illinois statutory and common law.

2.      Subject matter jurisdiction against Defendants Ronald Fajerstein, Kyla Fajerstein, Fajerstein Diamond Importers and Cutters, Inc., Susan Pierce Tomczak and Tal Landau is proper pursuant to 28 U.S.C. §1331 and 1343.

3.      Supplemental jurisdiction over the state causes of action Defendants Ronald Fajerstein, Kyla Fajerstein, Fajerstein Diamond Importers and Cutters, Inc., Susan Pierce Tomczak and Tal Landau is proper generally pursuant to 28 U.S.C. §1367.

4.      Supplemental jurisdiction over the state causes of action against Defendants Laury Rose and Candlelight Jewelry, Inc., is proper pursuant to 28 U.S.C. §1367(a), commonly referred to as "pendant party" jurisdiction, because the causes of action arise from a common nucleus of operative facts and they are so related to the claims in this lawsuit that they form part of the same case or controversy under Article III of the United States Constitution.

5.      Venue is proper in this district pursuant to 28 U.S.C. §1391(b) because Plaintiff's claims arise in this district.

## THE PARTIES

6.      Robert T. Geras ("Robert") is an individual who maintains his principal residence in the County of Cook, State of Illinois.

7.      LaSalle Investments, Incorporated ("LaSalle Investments") is an Illinois corporation with its principal place of business in the County of Cook, State of Illinois.

8.      Ronald Fajerstein ("Ronald") is an individual who maintains his principal residence in the County of Cook, State of Illinois.

9.      Kyla Fajerstein ("Kyla") is an individual who maintains her principal residence in the County of Cook, State of Illinois.

10.      On information and belief, Ronald and Kyla are husband and wife.

11.     Fajerstein Diamond Importers & Cutters, Inc. ("Fajerstein Diamond") is an Illinois corporation with its principal place of business in the County of Cook, State of Illinois. Ronald is the president of Fajerstein Diamond. On information and belief, Kyla is an officer of Fajerstein Diamond.

12.     Tal Landau ("Landau") is an individual who maintains his principal residence in the County of Lake, State of Illinois. On information and belief, Landau is a salesperson employed by Fajerstein Diamond.

13.     Susan Pierce Tomczak ("Tomczak") is an individual who maintains her principal residence in the County of Cook, State of Illinois. On information and belief, Tomczak is an office assistant and salesperson employed by Fajerstein Diamond.

14.     Laury Rose ("Rose") is an individual who maintains his principal residence in the County of Cook, State of Illinois.

15.     Candlelight Jewelry Manufacturing, Inc. ("Candlelight Jewelry") is an Illinois corporation with its principal place of business in the County of Cook, State of Illinois. On information and belief, Rose is president of Candlelight Jewelry.

16.     Stani Van Blerk ("Stani") is an individual who maintains his principal residence in Antwerp, Belgium.

## BACKGROUND

17.     Fajerstein Diamond is a business specializing in the wholesale purchase and sale of diamonds in interstate and foreign commerce. Fajerstein Diamond, Ronald and Kyla (hereinafter referred to collectively as "the Fajersteins") obtain certifications from the European Gemological Laboratory ("EGL") for diamonds purchased and sold by Fajerstein Diamond.

**A.     The Diamond Certification Scheme.**

18.     The Fajersteins, Landau and Tomczak have engaged in and are currently engaging in a fraudulent scheme (the "Diamond Certification Scheme"), wherein they obtain fraudulent diamond certifications (the "Fraudulent Certifications"). The Fraudulent Certifications state that the subject diamond is of a greater color or clarity than its actual condition. In this way, the Fajersteins manipulate the diamond's market value on fraudulent pretenses.

19.     The Fajersteins, Landau and Tomczak obtain the Fraudulent Certifications through Stani. On information and belief, Stani maintains direct contact with the EGL employees that generate the Fraudulent Certifications.

20.     The Fajersteins, Landau and Tomczak often do not send Stani the diamond for which they are seeking a certification. Rather, they send Stani a graphic image of a diamond generated by a Sarin machine, which describes the measurement of the diamond, for presentation to Stani's contacts at EGL. On information and belief, the Fajersteins possess a Sarin machine.

21.     On information and belief, EGL generates the Fraudulent Certifications for diamonds pursuant to the request of the Fajersteins, Landau, Tomczak and Stani. The Fraudulent Certifications are given to Stani by EGL. Upon reviewing the Fraudulent Certifications from EGL, Stani sends the same to Richard Goynslor ("Richard") and United Gem, Ltd. ("United Gem"), who then provide the same to the Fajersteins, Landau or Tomczak.

22.     On information and belief, in furtherance of the Diamond Certification Scheme, the Fajersteins, Landau and Tomczak knowingly sold diamonds in conjunction with the use of the Fraudulent Certifications. On information and belief, Landau and Tomczak conspired with the Fajersteins to defraud Robert and LaSalle Investments (hereinafter collectively referred to as "Geras") of not less than $388,000.

**B.     The Fraudulent Certification Sales Scheme.**

23.     The Fajersteins have engaged and are currently engaging in a second fraudulent scheme whereby the Fajersteins sell the Fraudulent Certifications to other diamond dealers. On information and belief, the diamond dealers then use the Fraudulent Certifications to defraud customers in the general public.

24.     In furtherance of the Fraudulent Certification Sales Scheme, the Fajersteins charge other diamond dealers between $100.00 and $600.00 for each Fraudulent Certification.

## FACTS SPECIFIC TO PLAINTIFFS

25.     Over the past several years, Geras purchased diamonds from Fajerstein Diamond for various occasions.

### A.     The Initial Purchase, The Initial Solicitation And The Joint Venture.

26.     On or about March 25, 2006, Robert purchased a 5.51 carat diamond from Fajerstein Diamond (the "Initial Purchase"). Robert made the Initial Purchase via check in the amount of $50,000.00 (the "March Check"). On information and belief, Ronald induced Robert to make the Initial Purchase by using a Fraudulent Certification.  Subsequently, Ronald exchanged the Initial Purchase for a 9.08 carat diamond (the "9 Carat Diamond"). Ronald represented that the 9 Carat Diamond was worth a wholesale price of $77,500.00. Robert currently has possession of the 9 Carat Diamond.

27.     At the time the Initial Purchase was made, Ronald initiated a conversation with Robert regarding the market for the purchase and sale of large-cut, investment quality diamonds (the "Initial Solicitation").

28.     Ronald represented that DeBeers was "holding back" large-cut investment quality diamonds from the market for the purpose of decreasing supply and thus significantly increasing the value of large-cut investment quality stones on the market. Ronald further represented that as

a result, these stones are in short supply and that if Ronald had some working capital, with his buying skills, and contacts he could buy those large stones and quickly sell them at significant profit. On information and belief, such would be generated, in part, through the use of Fraudulent Certification.

29.     Ronald solicited the financial assistance of Geras regarding the purchase and sale of such large-cut, investment quality diamonds (the "Diamonds"). Ronald represented that he had contacts in Antwerp, Belgium, and throughout the world, that would supply the Diamonds.

30.     Geras agreed to supply the capital (the "Investment") and Ronald represented that he had the market knowledge to purchase and sell the Diamonds for profit. Ronald stated that the profit would be the difference between the actual acquisition cost of the Diamonds and their subsequent sales price. Ronald stated that as sales of these stones took place, the Investment would be returned and the remaining profit would then be split equally between Ronald, on the one hand, and Geras, on the other hand (the "Joint Venture"). Ronald represented that he would maintain separate books and records for the Joint Venture and that he would treat the Joint Venture as a separate entity from Fajerstein Diamond.

**B.    The April Wire Transfer.**

31.    On April 25, 2006, Geras provided Ronald with $223,000.00 via wire transfer (the "April Wire Transfer").    Geras made the April Wire Transfer in reliance on Ronald's representation that he would immediately purchase a 15.98 carat, marquis cut, diamond (the "Brown Diamond")   for $150,000.00, among other stones.

32.    Ronald misrepresented to Geras that the April Wire Transfer must be made immediately in order to prevent other diamond dealers from purchasing the Brown Diamond before he could acquire it.

33.    Ronald never intended to purchase the Brown Diamond because he was holding the Brown Diamond prior to the time of the Initial Solicitation and the April Wire Transfer.

34.    On information and belief, Ronald is still negotiating with the owner of the Brown Diamond, offering him $70,000.00, an amount that is less than half of what Ronald stated was the purchase price of the Brown Diamond.

35.    On information and belief, Ronald never had the intention to apply the April Wire Transfer to the Joint Venture, but rather intended to use such monies for the payment of his personal and business liabilities.

**C.    The May Wire Transfer.**

36.    On May 11, 2006, the Fajersteins solicited additional funds from Geras purportedly to be contributed to the Joint Venture.  Ronald and Kyla requested that Geras make an immediate wire transfer of $115,000.00 (the "May Wire Transfer") for the purchase of one (1) large "Asscher-Cut" diamond to be sold on the open market at a significant profit.

37. Ronald and Kyla represented that the Asscher-Cut diamonds were extremely rare and fell within the agreed upon criteria for the Investment and would be used in conjunction with the Joint Venture.

38. Despite Geras' prompt execution of the May Wire Transfer, Ronald subsequently informed Geras that the Asscher-Cut diamond was no longer available. Ronald and Kyla retained the funds from the May Wire Transfer.

39. On information and belief, Ronald never had the intention to apply the May Wire Transfer to the Joint Venture, but rather intended to use such monies for the payment of his personal and business liabilities.

40. On or about early June, 2006, an employee of Fajerstein Diamond informed Geras that, contrary to Ronald and Kyla's prior statements, they had no intention of using the Investment for the purchase of any diamonds in furtherance of the Joint Venture.

**D. Loss Of The Brown Diamond.**

41. After obtaining the April Wire Transfer, Ronald informed Geras that he would send the Brown Diamond to Sundance Diamonds ("Sundance") for processing. Sundance provides a service that uses high pressure and high temperature ("HPHT") to improve or change the color of a diamond, thereby increasing the diamond's market value. Due to the extreme conditions of HPHT processing, a substantial risk exists that the mechanical equipment may fail and cause a sudden drop in pressure, resulting in the diamond converting to graphite, rendering it virtually worthless.

42. Ronald stated to Geras that the Brown Diamond was a good candidate for the HPHT processing without informing him of the substantial inherent risks of that process. Ronald further misrepresented to Geras that after the HPHT processing, the Brown Diamond would be

8

worth at least $250,000 and maybe as much as $350,000. On information and belief, the market value of the Brown Diamond could only reach between $250,000 and $350,000 through the use of a Fraudulent Certification.

43.     On or about early June, 2006, Ronald stated that he sent the Brown Diamond to Sundance. Ronald and Kyla represented to Geras that the Brown Diamond was covered by insurance to protect against any loss.

44.     The Brown Diamond was not covered under any insurance policy.

45.     On or about early July, 2006, Sundance conducted the HPHT processing with the Brown Diamond. During the HPHT process, a mechanical failure caused an immediate pressure loss and subsequent graphitization and loss of the Brown Diamond.

46.     Subsequent to the loss of the Brown Diamond, an employee of Fajerstein Diamond contacted Geras to schedule a meeting between Ronald, Kyla and Geras. The employee indicated that Ronald and Kyla intended on informing Geras that the Brown Diamond was destroyed and that it was not purchased pursuant to the Joint Venture, but rather purchased, individually, by Geras.

**E.      The Five Carat Diamonds.**

47.     On or about July 11, 2006, Robert informed Ronald and Kyla of the possibility that personal acquaintances of Robert may wish to purchase Diamonds from the Joint Venture.

48.     Fajerstein Diamond provided Geras with four diamonds (the "Five Carat Diamonds"). The Five Carat Diamonds weighed 5.01, 5.02, 5.13 and 5.51 carats, respectively.

49.     On or about July 12, 2006, Landau provided Geras with an additional 8.26 carat diamond (the "8 Carat Diamond") which he stated was on consignment from one of Fajerstein Diamond's customers who wanted $80,000 for the stone.

50.     Robert's personal acquaintances did not purchase the Five Carat Diamonds or the 8 Carat Diamond because, after seeing the stones, they were skeptical about the stated clarity and color and asking price of the stones.

**F.     The Office Meeting.**

51.     After July 12, 2006, but prior to August 16, 2006, Ronald, Kyla and Geras had a meeting at Fajerstein Diamond (the "Office Meeting").

52.     During the Office Meeting, Ronald and Kyla attempted to deny the existence of the Joint Venture and stated that Robert had purchased the Brown Diamond and the Five Carat Diamonds for his own account.

53.     Robert adamantly objected to Ronald and Kyla's statements that he had purchased the Brown Diamond and the Five Carat Diamonds for his own account.

54.     Robert's objections were based on Ronald and Kyla's prior representations and Robert's clear understanding based on their prior representations that the Brown Diamond was an asset of the Joint Venture and that Geras was trying to sell the 5 Carat Diamonds to recoup part of the Investment which was not used for the Joint Venture.

55.     Based on Robert's realization that he was being deceived by Ronald and Kyla, Geras demanded the immediate return of the Investment and, until payment, demanded collateral in an amount equal to the Investment.

**G.     The Union League Club Meeting.**

56.     On or about August 16, 2006, a meeting was held at the Union League Club in Chicago, Illinois between Geras, Ronald and Kyla (the "Union League Club Meeting"). During the Union League Club Meeting, Robert again confronted Ronald and Kyla regarding Ronald and  Kyla's misuse of the Investment dollars wired to them.

57.     Ronald and Kyla adamantly denied any wrongdoing with respect to the Investment. In a melodramatic effort to prove their truthfulness, Kyla removed her personal jewelry and gave it to Geras as partial security for the Investment.

58.     Ronald and Kyla used the delivery of the personal jewelry to entice Geras to sell two of the 5 Carat Diamonds to Babitsky and that the proceeds from that sale would be paid to Geras as partial repayment of the Investment.

59.     Ronald and Kyla further stated that Candlelight Jewelry had a buyer for the 8 Carat Diamond. Pursuant to that representation, Ronald and Kyla strongly urged Geras to either deliver it himself to Rose or hand the stone to Landau to deliver it on Geras' behalf. In either case, Ron, Kyla and Landau promised that the proceeds of the sale would be guaranteed to go to Geras as partial repayment of the Investment.

60.     Upon Kyla's insistence, Geras left the Union League Club Meeting with Kyla's personal jewelry as partial security for the Investment in accordance with Kyla's offer.

61.     Contrary to Ronald and Kyla's previous statement regarding partial security, Geras subsequently received a memorandum in the amount of $40,000 from Fajerstein Diamond for the purported fair market value of Kyla's jewelry.

**H.     The Candlelight Conspiracy.**

62.     On or about August 20, 2006, Landau contacted Geras and indicated that Rose and Candlelight Jewelry had a client who would purchase the 8 Carat Diamond.

63.     On information and belief, Rose conspired with Landau, Ronald and Kyla to defraud Geras by obtaining the 8 Carat Diamond and returning the same to the Fajersteins.

64.     On August 21, 2006, Geras delivered the 8 Carat Diamond to Rose and Candlelight Jewelry. Geras, on behalf of LaSalle Investments, presented a memorandum for

$80,000 (the "Candlelight Jewelry Memorandum"). A copy of the Candlelight Jewelry Memorandum is attached hereto and incorporated herein as Exhibit "A."

65.     On information and belief, Rose returned the 8 Carat Diamond to the Fajersteins.

66.     LaSalle Investments has not received payment for the 8 Carat Diamond from Rose or Candlelight Jewelry.

67.     Geras has made demands upon Babitsky and Club Jewelry and Rose and Candlelight Jewelry, respectively. To date, Robert has not received payment pursuant to the Club Jewelry Memorandum and LaSalle Investments has not received the 8 Carat Diamond or payment pursuant to the Candlelight Jewelry Memorandum.

68.     Geras has made several demands upon the Fajersteins to return the Investment. To date, the Fajersteins have not returned any part of the Investment.

69.     The Fajersteins have, instead, made a bizarre demand on Geras for additional payment of an additional $400,000. That demand totally disregards the $388,000 advanced to date by Geras, comprising the Investment, none of which was used for the purposes represented.

## COUNT I
## VIOLATION UNDER THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 USC § 1962(a)) (The Fajersteins, Tomczak, Landau & Stani)

1-69.     Geras repeats and realleges paragraphs 1 through 76, inclusive, as paragraphs 1 through 69, inclusive, of this Count I.

70.     Section 1962(a) of RICO states, in pertinent part, that:

> [i]t shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income in . . . the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

71.     The Fajersteins, Landau, Tomczak, Richards, United Gem and Stani are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(a), in that they are each an "entity capable of holding a legal or beneficial interest in property."

72.     On information and belief, at all relevant times hereto, one of the purposes and functions of Fajerstein Diamond was and is the purchase and sale of diamonds in interstate and foreign commerce. Ronald, Kyla, Landau and Tomczak own in whole or in part, are employed by or associated with Fajerstein Diamond. In addition to its legitimate activities, Fajerstein Diamond allowed its structure to be used to carry out the fraudulent activities at issue herein against Geras and others.

73.     Stani obtained the Fraudulent Certifications for use in carrying out some or all of the Diamond Certification Scheme, the Fraudulent Diamond Certification Sales Scheme, the Joint Venture, the March Check, the Investment, and the Candlelight Conspiracy (collectively, the "Conspiracies"). On information and belief, Stani then sent the Fraudulent Certifications to Richard and United Gem, who then provided the Fraudulent Certifications to the Fajersteins, Tomczak or Landau. The Fajersteins, Landau and Tomczak made numerous false statements of material fact to Geras, and used the Fraudulent Certifications to induce Geras to make the Investment (the "Statements"). Thus, the Fajersteins, Landau, Tomczak, and Stani are a group of persons associated together in fact for the common purpose of carrying out the Conspiracies.

74.     As a result, the Fajersteins, Landau, Tomczak, and Stani constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a) (the "Associated Enterprise").

75.     In the alternative, Fajerstein Diamond is the enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a) (the "Fajerstein Enterprise").

76.    During all times relevant hereto, the Associated Enterprise, or in the alternative, the Fajerstein Enterprise, were engaged in, and their activities affected by, interstate and foreign commerce.

77.    Ronald, Kyla, Landau, Tomczak and Stani intentionally, knowingly and willfully associated with the Associated Enterprise, on in the alternative the Fajerstein Enterprise, and conducted and participated in the Associated Enterprise, or in the alternative the Fajerstein Enterprise's, affairs.

78.    Ronald, Kyla, Landau, Tomczak and Stani have intentionally, knowingly and willingly conducted the affairs of the Associated Enterprise, or in the alternative the Fajerstein Enterprise, directly or indirectly, through a pattern of racketeering activity, within the meaning of 18 U.S.C. §§ 1961(5) and 1962(a), in violation of 18 USC §§§§ 1961(1)(B), 1962(a) and 1343, by engaging, aiding and abetting in the commission of numerous predicate acts, including:

        a.    Operating a fraudulent scheme in violation of 18 USC §§§ 1961(1)(B), 1341, 1343, wherein the Fraudulent Certifications were and are prepared, purchased and sent, via the mail and via the wire through facsimile, for use in conjunction with the sale of diamonds in interstate and foreign commerce;

        b.    Operating a fraudulent scheme in violation of 18 USC §§§ 1961(1)(B), 1341 and 1343, wherein the Fraudulent Certifications were and are sold amongst jewelers, including but not limited to, Fajerstein Diamond, in conjunction with the purchase and sale of diamonds for use in interstate and foreign commerce;

        c.    Obtaining the April Wire Transfer via the wire, pursuant to the Statements, in violation of 18 USC §§ 1961(1)(B) and 1343;

        d.    Obtaining the May Wire Transfer via the wire, pursuant to the Statements, in violation of 18 USC §§ 1961(1)(B) and 1343;

79.    The predicate acts committed by the Fajersteins, Tomczak, Landau and Stani were intentionally, knowingly and willingly calculated to specifically defraud Geras out of the Investment and to hold out the possibility of gaining a greater profit through the use of the

Fraudulent Certifications without disclosing said use to Geras but to the detriment of Geras and the general public.

80.     The Fajersteins, Tomczak and Landau obtained income, directly or indirectly, in the form of the Investment, in part, and the proceeds from the Diamond Certification Scheme and the Fraudulent Certification Sales Scheme, for use in the continued operation of the Associated Enterprise, on in the alternative the Fajerstein Enterprise, to purchase and sell diamonds in interstate and foreign commerce using the Fraudulent Certifications,.

81.     On information and belief, Stani obtained and received income in the form of payments from the Fajersteins for obtaining the Fraudulent Certifications for use in conjunction with the purchase and sale of diamonds in foreign and interstate commerce and for use in the continued operation of the Associated Enterprise, or in the alternative, the Fajerstein Enterprise.

82.     On information and belief, the pattern of racketeering activity by the Fajersteins, Tomczak, Landau and Stani to commit the predicate acts described herein are a part of their regular way of conducting Fajerstein Diamond and the business of buying and selling diamonds in interstate and foreign commerce.

83.     The pattern of racketeering activity of the Fajersteins, Landau, Tomczak and Stani to commit the predicates acts described herein, by its nature, projects indefinitely into the future with a specific threat of repetition.  Thus, there is a substantial likelihood that the Fajersteins, Landau, Tomczak and Stani will continue to operate the Conspiracies, through the Associated Enterprise or, in the alternative the Fajerstein Enterprise, in violation of 18 USC §§§§ 1961(1)(B), 1962(a), 1341 and 1343.

84.     As a direct and proximate cause of the pattern of racketeering activity of the Fajersteins, Landau, Tomczak and Stani to commit the predicates acts described herein, Geras

has been injured and damaged in their business and property within the meaning of 18 U.S.C. § 1964(a), in that Geras has been defrauded out of the Investment in an amount not less than $388,000, among other things.

WHEREFORE, Plaintiffs Robert T. Geras and LaSalle Investments, Incorporated, pray for judgment in their favor and against Defendants Ronald Fajerstein, Kyla Fajerstein, Fajerstein Diamond Importers & Cutters, Inc., Tal Landau, Susan Pierce Tomczak and Stani Van Blerk jointly and severally, in an amount not less than $388,000, plus treble damages, attorneys' fees and costs, and such other and further relief as this Court deems just and equitable.

**COUNT II**
**VIOLATION UNDER THE RACKETEER INFLUENCED**
**AND CORRUPT ORGANIZATIONS ACT (18 USC § 1962(c))**
**(The Fajersteins, Tomczak, Landau & Stani)**

1-84.   Geras repeats and realleges paragraphs 1 through 84, inclusive of Count I, as paragraphs 1 through 84, inclusive, of this Count II.

85.   Section 1962(c) of RICO states, in pertinent part, that:

> [i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

86.   The Fajersteins, Landau, Tomczak and Stani are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c), in that they are each an "entity capable of holding a legal or beneficial interest in property."

87.   The Associated Enterprise, or in the alternative the Fajerstein Enterprise, constitutes an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (the "Associated Enterprise").

88.     The Fajersteins, Tomczak, Landau and Stani conducted and participated in the Associated Enterprise, or in the alternative the Fajerstein Enterprise's, affairs through a pattern of racketeering activity, within the meaning of 18 U.S.C. §§ 1961(5) and 1962(c), to commit the predicate acts described herein with respect to the Conspiracies, in violation of 18 USC §§§§ 1961(1)(B), 1962(c), 1341 and 1343.

89.     The pattern of racketeering activity of the Fajersteins, Landau, Tomczak and Stani to commit the predicates acts described herein, by its nature, projects indefinitely into the future with a specific threat of repetition.  Thus, there is a substantial likelihood that the Fajersteins, Landau, Tomczak and Stani will continue to operate the Conspiracies, through the Associated Enterprise or in the alternative the Fajerstein Enterprise, in violation of 18 USC §§§§ 1961(1)(B), 1962(c), 1341 and 1343.

90.     As a direct and proximate cause of the pattern of racketeering activity of the Fajersteins, Landau, Tomczak and Stani to commit the predicates acts described herein, Geras has been injured and damaged in their business and property within the meaning of 18 U.S.C. § 1964(c), in that Geras has been defrauded out of the Investment in an amount not less than $388,000, among other things.

WHEREFORE, Plaintiffs Robert T. Geras and LaSalle Investments, Incorporated, pray for judgment in their favor and against Defendants Ronald Fajerstein, Kyla Fajerstein, Fajerstein Diamond Importers & Cutters, Inc., Tal Landau, Susan Pierce Tomczak and Stani Van Blerk jointly and severally, in an amount not less than $388,000, plus treble damages, attorneys' fees and costs, and such other and further relief as this Court deems just and equitable.

## COUNT III
## CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED
## AND CORRUPT ORGANIZATIONS ACT (18 USC 1962(d))
### (The Fajersteins, Tomczak, Landau & Stani)

1-90.    Geras repeats and realleges paragraphs 1 through 90, inclusive of Count II, as paragraphs 1 through 90, inclusive, of this Count III.

91.    Section 1962(d) of RICO states that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

92.    The Fajersteins, Landau, Tomczak, Richard, United Gem and Stani are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(d), in that they are each an "entity capable of holding a legal or beneficial interest in property."

93.    The Fajersteins, Tomczak, Landau and Stani each were associated with the Associated Enterprise and agreed and conspired to violate 18 U.S.C. §§ 1962(a) and 1962(c), that is, agreed to conduct and participate, directly or indirectly, in the conduct of the affairs of the Associated Enterprise through a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5), in violation of 18 U.S.C. § 1962(d).

94.    The Fajersteins, Tomczak, Landau and Stani committed and caused to be committed a series of overt acts in furtherance of the Conspiracies, including but not limited to the predicate acts set forth herein.

95.    As a result of the Fajersteins, Tomczak, Landau and Stani's violations of 18 U.S.C. § 1962(d), Geras was defrauded out of an amount not less than $388,000, and has therefore been injured and damaged in their business and property within the meaning of 18 U.S.C. §§ 1962(a) and 1962(c), in that Geras has been defrauded out of the Investment, among other things.

WHEREFORE, Plaintiffs Robert T. Geras and LaSalle Investments, Incorporated, pray for judgment in their favor and against Defendants Ronald Fajerstein, Kyla Fajerstein, Fajerstein Diamond Importers & Cutters, Inc., Tal Landau, Susan Pierce Tomczak and Stani Van Blerk jointly and severally, in an amount not less than $388,000, plus treble damages, attorneys' fees and costs, and such other and further relief as this Court deems just and equitable.

## COUNT IV
### VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS § 505/1, *et. seq.*)
### (All Defendants)
### (Illinois)

1-95. Geras repeat and realleges paragraphs 1 through 95, inclusive of Count III, as paragraphs 1 through 95, inclusive, of this Count IV.

96. This Count IV is brought pursuant the Illinois Consumer Fraud and Deceptive Business Practices Act (hereinafter "the Consumer Fraud Act"), 815 ILCS § 505/1 *et. seq.*

97. Section 2 of the Consumer Fraud Act, 815 ILCS § 505/2, states in pertinent part:

> Unfair...or deceptive acts or practices, including but not limited to, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with the intent that others rely upon the concealment, suppression or omission of such material fact...in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

98. The Conspiracies were unfair and deceptive acts in violation of the Consumer Fraud Act.

99. Defendants have made the Statements to Geras with respect to the Conspiracies.

100. Defendants intended for Geras to rely upon the Statements.

101. Geras, by their reasonable reliance on the Statements, have been misled, deceived and damaged by the Statements made in furtherance of the Conspiracies.

WHEREFORE, Plaintiffs Robert T. Geras and LaSalle Investments, Incorporated, pray for judgment in their favor and against Defendants Ronald Fajerstein, Kyla Fajerstein, Fajerstein Diamond Importers & Cutters, Inc., Tal Landau, Susan Pierce Tomczak, Laury Rose, Candlelight Jewelry, Inc., and Stani Van Blerk jointly and severally, in an amount not less than $388,000, plus punitive damages and such other and further relief as this Court deems just and equitable.

**COUNT V**
**CIVIL CONSPIRACY TO VIOLATE THE ILLINOIS CONSUMER FRAUD AND**
**DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS § 505/1, *et. seq.*)**
**(All Defendants)**
**(Illinois)**

1-101. Geras repeats and realleges paragraphs 1 through 101 inclusive of Count IV, as paragraphs 1 through 101, inclusive, of this Count V.

102. Defendants have agreed to intentionally, maliciously, unlawfully and wrongfully defraud Geras, with respect to the Conspiracies, in violation of the Consumer Fraud Act.

103. Defendants actions to defraud Geras, were tortious acts committed in furtherance of the Conspiracies to violate the Consumer Fraud Act.

104. Malice is the gist of this action.

WHEREFORE, Plaintiffs Robert T. Geras and LaSalle Investments, Incorporated, pray for judgment in their favor and against Defendants Ronald Fajerstein, Kyla Fajerstein, Fajerstein Diamond Importers & Cutters, Inc., Tal Landau, Susan Pierce Tomczak, Laury Rose, Candlelight Jewelry, Inc., and Stani Van Blerk jointly and severally, in an amount not less than $388,000, plus punitive damages and such other and further relief as this Court deems just and equitable.

20

## COUNT VI
## VIOLATION OF THE UNIFORM DECEPTIVE
## TRADE PRACTICES ACT (805 ILCS § 510/1, *et. seq.*)
### (All Defendants)
### (Illinois)

1-104. Geras repeats and realleges paragraphs 1 through 104, inclusive of Count V, as

paragraphs 1 through 104, inclusive, of this Count VI.

105. This Count VI is brought pursuant the Uniform Deceptive Trade Practices Act

(hereinafter the "Deceptive Trade Practices Act"), 815 ILCS § 510/1 *et. seq.*

106. Section 2(a) of the Deceptive Trade Practices Act, 815 ILCS § 510/2(a), states in

pertinent part that:

> A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person:
>
> > (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have;
> >
> > (7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another;
> >
> > (8) disparages the goods, services, or business of another by false or misleading representation of fact;
> >
> > (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

107. Defendants violated the Deceptive Trade Practices Act by orchestrating or

otherwise participating in the Conspiracies.

WHEREFORE, Plaintiffs Robert T. Geras and LaSalle Investments, Incorporated, pray

for judgment in their favor and against Defendants Ronald Fajerstein, Kyla Fajerstein, Fajerstein

Diamond Importers & Cutters, Inc., Tal Landau, Susan Pierce Tomczak, Laury Rose,

21

Candlelight Jewelry, Inc., and Stani Van Blerk jointly and severally, in an amount not less than $388,000, plus attorneys' fees and costs, and such other and further relief as this Court deems just and equitable.

**COUNT VII**
**CIVIL CONSPIRACY TO VIOLATE THE UNIFORM DECEPTIVE**
**TRADE PRACTICES ACT (805 ILCS § 510/1, *et. seq.*)**
**(All Defendants)**
**(Illinois)**

1-107. Geras repeats and realleges paragraphs 1 through 107, inclusive of Count V, as paragraphs 1 through 107, inclusive, of this Count VII.

108. Defendants have agreed to maliciously, unlawfully and wrongfully defraud Geras with respect to the Conspiracies to violate the Deceptive Trade Practices Act.

109. Defendants' actions to defraud Geras were tortious acts committed in furtherance of the Conspiracies to violate of the Deceptive Trade Practices Act.

110. Malice is the gist of this action.

WHEREFORE, Plaintiffs Robert T. Geras and LaSalle Investments, Incorporated, pray for judgment in their favor and against Defendants Ronald Fajerstein, Kyla Fajerstein, Fajerstein Diamond Importers & Cutters, Inc., Tal Landau, Susan Pierce Tomczak, Laury Rose, Candlelight Jewelry, Inc., and Stani Van Blerk jointly and severally, in an amount not less than $388,000, plus punitive damages, and such other and further relief as this Court deems just and equitable.

## COUNT VIII
## FRAUD
### (All Defendants)
### (Illinois)

1-110.   Geras repeats and realleges paragraphs 1 through 110, inclusive of Count VII herein, as paragraphs 1 through 110, inclusive, of this Count VIII.

111.   The individual Defendants have made the Statements in furtherance of the Conspiracies.

112.   The individual Defendants had knowledge at the time the Statements were made that the Statements made in conjunction with the Conspiracies were false.

113.   Defendants intended to induce Geras to rely upon the Statements.

114.   Geras reasonably relied upon the Statements to their detriment.

115.   Geras has been damaged in an amount in excess of $388,000 as a result of his reasonable reliance on the Statements.

WHEREFORE, Plaintiffs Robert T. Geras and LaSalle Investments, Incorporated, pray for judgment in their favor and against Defendants Ronald Fajerstein, Kyla Fajerstein, Fajerstein Diamond Importers & Cutters, Inc., Tal Landau, Susan Pierce Tomczak, Laury Rose, Candlelight Jewelry, Inc., and Stani Van Blerk jointly and severally, in an amount not less than $388,000, plus punitive damages, and such other and further relief as this Court deems just and equitable.

## COUNT IX
## CONVERSION
### (The Fajersteins)
### (Illinois)

1-115. Geras repeats and realleges paragraphs 1 through 115, inclusive of Count VIII, as paragraphs 1 through115, inclusive, of this Count IX.

116.     The Fajersteins have wrongfully maintained control, dominion and ownership over the March Check, the April Wire Transfer and the May Wire Transfer.

117.     Geras has an immediate right to the recovery of the March Check, the April Wire Transfer and the May Wire Transfer, as they were acquired in furtherance of the Conspiracies.

118.     Geras has made several demands for return of the March Check, the April Wire Transfer and the May Wire Transfer.

WHEREFORE, Plaintiffs Robert T Geras and LaSalle Investments, Incorporated, pray for judgment in their favor and against Defendants Ronald Fajerstein, Kyle Fajerstein, and Fajerstein Diamond Importers &  Cutters, Inc., jointly and severally, in an amount not less than $388,000, plus punitive damages, and such other and further relief as this Court deems just and equitable.

## COUNT X
## BREACH OF FIDUCIARY DUTY
### (Ronald)
### (Illinois)

1-118. Geras repeats and realleges paragraphs 1 through 118, of Count IX, as paragraphs 1 through 118, inclusive, of this Count X.

119.     As a member of the Joint Venture, as a partner of Robert in the Joint Venture, and as a result of Ronald's agreement to exercise judgment on behalf of the Joint Venture, Ronald

has a fiduciary relationship with Geras and thereby must maintain the fiduciary duties of loyalty, honesty and fair-dealing, among others.

120.    Ronald has breached his fiduciary duties to Geras by knowingly and intentionally making the Statements and orchestrating or otherwise participating in the Conspiracies.

121.    Ronald has caused injury to Geras by wrongfully retaining the March Check, the April Wire Transfer and the May Wire Transfer.

122.    Geras' injury was proximately caused by Ronald's breach of his fiduciary duties to Geras.

WHEREFORE, Plaintiff Robert T. Geras prays for judgment in his favor and against Defendant Ronald Fajerstein, in an amount not less than $388,000, plus punitive damages, and such other and further relief as this Court deems just and equitable.

## COUNT XI
## BREACH OF CONTRACT
### (Rose & Candlelight Jewelry)
### (Illinois)

1-122. LaSalle Investments repeats and realleges paragraphs 1 through 122, inclusive of Count X, as paragraphs 1 through 122, inclusive, of this Count XI.

123.    On August 21, 2006, Geras took the 8 Carat Diamond to Candlelight Jewelry, pursuant to Landau, Ronald, and Kyla's representations that Rose and Candlelight Jewelry were interested in purchasing the same.

124.    At that time, Geras delivered the 8 Carat Diamond and presented Rose with the Candlelight Jewelry Memorandum which Rose then signed thereby acknowledging the terms and conditions of the memorandum. See Exhibit "B."

125.    Pursuant to the Candlelight Jewelry Memorandum, Rose and Candlelight Jewelry agreed to pay LaSalle Investments $80,000 in the event of sale or loss of the 8 Carat Diamond.

126.    On information and belief, Rose and Candlelight Jewelry returned the 8 Carat Diamond to the Fajersteins.

127.    Pursuant to the Candlelight Jewelry Memorandum, Rose and Candlelight Jewelry agreed to "pay all of [LaSalle Investments'] costs, including court costs, interest (18% per annum to begin accruing after 30 days), reasonable attorney's fees and all ancillary expenses, in the event it is necessary for [LaSalle Investments'] to enforce its rights" under the Candlelight Jewelry Memorandum.

128.    LaSalle Investments has not received any payment for the 8 Carat Diamond from Rose or Candlelight Jewelry.

WHEREFORE, Plaintiff LaSalle Investments, Incorporated, prays for judgment in its favor and against Defendants Laury Rose and Candlelight Jewelry, Inc., jointly and severally, in an amount not less than $80,000, plus attorneys' fees, costs and interest at a rate of 18% per annum, and such other and further relief as this Court deems just and equitable.

## COUNT XII
## FRAUD IN THE INDUCEMENT
### (Ronald)
### (Illinois)

1-128.    In the alternative, Geras repeats and realleges paragraphs 1 through 128, inclusive of Count XI, as paragraphs 1 through 128, inclusive, of this Count XII.

129.    On or about March 25, 2006, Ronald presented Geras with the Initial Solicitation.

130.   The Initial Solicitation was an offer for Geras to supply the Investment pursuant to the Joint Venture and for Geras to have an equal share in the profits of the Joint Venture in addition to the return of his Investment.

131.   Geras accepted the Initial Solicitation, thereby forming an oral contract to share in the profits of the Joint Venture (the "Joint Venture Contract").

132.   Pursuant to the Joint Venture Contract, Geras provided the Fajersteins with the April Wire Transfer and the May Wire Transfer.

133.   Ronald made the Statements, including the Initial Solicitation, with the intent to defraud Geras and with the intent to induce Geras to enter into the Joint Venture Contract.

134.   Geras would not have entered into the Joint Venture Contract, but for the numerous false Statements made by Ronald in conjunction with the Joint Venture and in pursuit of the Conspiracies.

135.   Geras reasonably relied upon the numerous false Statements made by Ronald in entering the Joint Venture Contract and in effecting the April Wire Transfer and the May Wire Transfer.

136.   Geras suffered damages as a result of their reasonable reliance upon the statements made in conjunction with the Joint Venture.

WHEREFORE, Plaintiffs Robert T. Geras and LaSalle Investments, Incorporated, pray for judgment in their favor and against Defendant Ronald Fajerstein, in an amount not less than $388,000, plus punitive damages and such other and further relief as this Court deems just and equitable.

## COUNT XIII
## UNJUST ENRICHMENT
### (The Fajersteins)
### (Illinois)

1-136. In the alternative, Geras repeats and realleges paragraphs 1 through 136, inclusive of Count XII, as paragraphs 1 through 136, inclusive, of this Count XIII.

137.    The Fajersteins have unjustly retained a benefit to Geras' detriment.

138.    The Fajersteins' retention of the benefit violates fundamental principals of justice, equity, and good conscience.

WHEREFORE, Plaintiffs Robert T. Geras and LaSalle Investments, Incorporated, pray for judgment in their favor and against Defendants Ronald Fajerstein, Kyla Fajerstein, and Fajerstein Diamond Importers & Cutters, Inc., jointly and severally, in an amount not less than $388,000, plus punitive damages and such other and further relief as this Court deems just and equitable.

ROBERT T. GERAS and LASALLE
INVESTMENTS, INCORPORATED,

By: /s/Timothy S. Buckley_____
One of their attorneys

Robert H. Itzkow, of Counsel (ARDC #3124517)
Timothy S. Buckley (ARDC #3128822)
Scott M. Levin (ARDC #6185743)
Matthew C. Wasserman (ARDC #6287638)
Defrees & Fiske LLC
200 S. Michigan Ave., #1100
Chicago, Illinois 60604
Tel.:  (312) 372-4000

# Exhibit "A"

.

ₑMORANDUM

#02125

## LaSalle Investments, Inc.

**Client:**

Candlelight Jewelers

7900 Milwaukee Avenue

Niles, IL

Tel: 847-965-3013

55 E. Erie Street

Suite 2905

Chicago, IL 60611

312-440-0040

Fax: 312-440-0805

Date: 21-Aug-06

Terms Of Payment: Memo

Broker:                          Tal

The merchandise described on this document is delivered to you on memorandum, at your risk from all hazards, regardless of the cause of loss or damage, only for examination and inspection by prospective purchasers, upon express condition that all such merchandise shall remain the property of LaSalle Investments, Inc. (LSI) and shall be immediately returned on demand, in full in its original form, at your expense. Until the merchandise is returned and actually received by us, you are fully responsible for it, and in the event of damage or loss, whether caused by you or another, whether or not under your control, you will indemnify us immediately by payment of the stated value which represents the extent of the actual loss and is not intended to constitute a price for the sale of the merchandise. You acquire no right or authority to sell, pledge, hypothecate, or otherwise dispose of the merchandise or any part thereof. It is expressly understood that regardless of other transactions or prior trade customs, no credit is extended with respect to this merchandise. A sale of all or any portion of the merchandise shall occur only if and when we agree and you shall have received from us a separate invoice. A subsequent sale of any specific part of the merchandise shall not affect the terms hereof with respect to the balance of the merchandise. The recipient of merchandise herein described agrees to pay all of LSI's costs, including court costs, interest (18% per annum to begin accruing after 30 days), reasonable attorney's fees and any and all ancillary expenses, in the event it is necessary for LSI to enforce its rights hereunder. Recipient further consents to the jurisdiction of the Circuit Court of Cook county, Illinois. Recipient hereby waives the right to a trial by jury. Receipt of the merchandise constitutes your agreement to these terms, which represent the parties' entire contract with respect to the merchandise described and which cannot be varied by oral statements, dealings with respect to other merchandise or any contrary custom of the trade.

| REMARKS | WEIGHT | QUALITY | LOT NUMBER | PRICE $/CT | TOTAL AMOUNT |
|---|---|---|---|---|---|
|  | 8.26 | G SI, | EX EX PA INT | | 80,000 |
|  | | | | | |
|  | | | | | |
|  | | | | | |
|  | | | | | |
|  | | | | | |
|  | | | | | |
|  | | | | | |
|  | | | | | |
|  | | | | | |
|  | | | | | |
|  | | | | | |
|  | | | | | |

Client signature: